Robert ILLARIO, Plaintiff,

v.

George FRAWLEY, President, Local 825, A, B, C, D, International Union of Operating Engineers, A.F.L.–C.I.O., et al., Defendants.

Civ. A. No. 76–1489.

United States District Court, D. New Jersey.

Feb. 16, 1977.

Brown & Vogelman by Raymond A. Brown, Jersey City, N. J., for plaintiff.

Schneider, Cohen & Solomon by David S. Solomon, Jersey City, N. J., for defendants George Frawley and Local 825.

Zazzali & Zazzali by James R. Zazzali, Newark, N. J., for defendant International Union of Operating Engineers.

Jonathan L. Goldstein, U. S. Atty. by Frank J. Scardilli, Asst. U. S. Atty., for defendant Dept. of Justice.

## OPINION

STERN, District Judge.

Robert Illario was appointed to the salaried position of Business Representative of Local 825 A, B, C, D of the International Union of Operating Engineers (hereinafter Local 825) on June 14, 1971. In 1974 he was elected to a three-year term as Vice President of the same Local. Illario's career as a labor leader was interrupted by his indictment by a New Jersey state-wide grand jury on October 30, 1974. The indictment charged Illario with two counts of bribery, in violation of N.J.S.A. 2A:93–6. It alleged in Count One that Illario

. . . did willfully, knowingly, and corruptly receive, offer to receive, and promise to receive money, that is, the sum of five thousand dollars ($5,000.00), from Edward O. Davis, an officer of Ropark Concrete Company, Incorporated, as a bribe, present and reward to obtain, secure and procure services, permission, approval, and other acts and things connected with and appertaining to offices and departments of the government of the Township of Woodbridge, that is, issuance of a building permit to Ropark
. . .,

and in Count Two that Illario committed a similar offense with regard to a Certificate of Occupancy for the same structure.

Illario entered a plea of not guilty to the charges. The case was moved for trial in January 1976. The State's case included numerous tape recordings of conversations between Davis and Illario, made with Davis's consent. After some fourteen days of trial, but before the close of the State's direct case, Illario entered into a plea bargain disposing of the pending bribery indictment. Under the terms of the plea bargain Illario waived grand jury indictment and permitted the State to file an Accusation charging that he

. . . did knowingly with intent to cheat Edward O. Davis, an officer in the Ropark Concrete Co., Inc., obtain money by means of false statements and representations that he would aid the said Edward O. Davis in expediting the issuance of a building permit for Ropark Concrete Co., Inc. in the Township of Woodbridge, in the county aforesaid
. . .,

in violation of N.J.S.A. 2A:111–1. Illario pleaded guilty to the Accusation. In return, the State agreed to dismiss the pending indictment and to take no position at sentencing. Illario was sentenced to a term of three months' imprisonment, the execution of which was suspended. He also was placed on probation for a period of one year or until repayment of $2,500 to Davis, whichever event occurred sooner. The bribery indictment was dismissed.

Several months after sentencing the United States Department of Justice communicated with the International Union and Local 825. The Department notified both organizations that it considered Illario to be barred by Title 29 U.S.C. § 504 from continuing to serve as a union official. Illario was immediately removed from his positions as Vice President and Business Representative of Local 825. Illario then brought suit against the President of Local 825, Local 825 itself, the International and the Department of Justice. He sought a declaratory judgment that the provisions of § 504 did not apply to his conviction, and requested reinstatement with back pay.

Illario initially sought a Temporary Restraining Order providing for his reinstatement. When that application was denied

by the Court, the case was set down for a preliminary injunction hearing. The defendants affiliated with the Union appeared in the lawsuit but did not resist the relief sought by Illario. The United States vigorously opposed plaintiff's application. All parties agreed that the case raised questions of law that could be decided on the basis of the record of proceedings in state court, and those proceedings were ordered filed. The United States cross-moved for a dismissal of the complaint under Rule 12(b), F.R.Civ.P.

■ Early District Court cases divided on the propriety of the exercise of jurisdiction over similar lawsuits. See, *e. g., Strauss v. I. B. T. et al.*, 179 F.Supp. 297, 299 (E.D.Pa. 1959). The issue was resolved in favor of jurisdiction under Title 28 U.S.C. § 1337 in *Serio v. Liss*, 300 F.2d 386, 387 (3rd Cir. 1961), a position to which the Court of Appeals adheres. *Bachowski v. Brennan*, 502 F.2d 79, 82–83 (3rd Cir. 1974), *rev'd on other grounds sub nom. Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). Despite *Serio*, some courts have refused jurisdiction when similar lawsuits were tendered by the union and the affected official in a collusive manner. The appearance and actual participation of the United States defendant in the instant lawsuit, however, presents the issues in an adversary context. *Compare Teamsters Local 513 v. Wojcik*, 325 F.Supp. 989 (E.D.Pa. 1971).[1]

Title 29 U.S.C. § 504 provides as follows:

§ 504. Prohibition against certain persons holding office; violations and penalties

(a) No person who is or has been a member of the Communist Party or who has been convicted of, or served any part of a prison term resulting from his conviction of, robbery, bribery, extortion, embezzlement, grand larceny, burglary, arson, violation of narcotics laws, murder, rape, assault with intent to kill, assault which inflicts grievous bodily injury, or a violation of subchapter III or IV of this chapter, or conspiracy to commit any such crimes, shall serve—

(1) as an officer, director, trustee, member of any executive board or similar governing body, business agent, manager, organizer, or other employee (other than as an employee performing exclusively clerical or custodial duties) of any labor organization, or

(2) as a labor relations consultant to a person engaged in an industry or activity affecting commerce, or as an officer, director, agent, or employee (other than as an employee performing exclusively clerical or custodial duties) of any group or association of employers dealing with any labor organization, during or for five years after the termination of his membership in the Communist Party, or for five years after such conviction or after the end of such imprisonment, unless prior to the end of such five-year period, in the case of a person so convicted or imprisoned, (A) his citizenship rights, having been revoked as a result of such conviction, have been fully restored, or (B) the Board of Parole of the United States Department of Justice determines that such person's service in any capacity referred to in clause (1) or (2) would not be contrary to the purposes of this chapter. Prior to making any such determination the Board shall hold an administrative hearing and shall give notice of such proceeding by certified mail to the State, county, and Federal prosecuting officials in the jurisdiction or jurisdictions in which such person was convicted. The Board's determination in any such proceeding shall be final. No labor organization or officer thereof shall knowingly permit any person to assume or hold any office or paid position in violation of this subsection.

(b) Any person who willfully violates this section shall be fined not more than

---

1. It should be noted, however, that the question of jurisdiction is not settled in all circuits. See *Driscoll v. International Union of Operating Engineers, Local 139*, 484 F.2d 682, 689 n. 18 (7th Cir. 1973); *Jackson v. Martin Co.*, 180 F.Supp. 475 (D.Md.1960); *cf. United States v. Jalas*, 409 F.2d 358 (7th Cir. 1969).

$10,000 or imprisoned for not more than one year, or both.

(c) For the purposes of this section, any person shall be deemed to have been "convicted" and under the disability of "conviction" from the date of the judgment of the trial court or the date of the final sustaining of such judgment on appeal, whichever is the later event, regardless of whether such conviction occurred before or after September 14, 1959.

The original indictment, charging Illario with bribery, is of course specifically included in § 504. The crime to which Illario pleaded guilty, however, obtaining money by false pretenses, is not. He contends that the proscriptions of the statute should not apply to him. The United States takes the contrary view.

 The task of this Court in interpreting the statute is well defined. Remedial statutes such as Title 29 U.S.C. § 504 must be construed ". . . in the light of the mischief to be corrected and the end to be attained." *Warner v. Goltra*, 293 U.S. 155, 158, 55 S.Ct. 46, 48, 79 L.Ed. 254 (1934). In the interpretation of such laws ". . . the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress." *United States v. American Trucking Associations*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940) (citations omitted). There is no doubt whatsoever as to the Congressional intent which prompted the enactment of § 504:

Congress' primary purpose for adopting the Landrum-Griffin Act, as evidenced by the legislative history, was to eliminate the intolerable and corrupt conditions which prevailed throughout segments of organized labor during the 1950's. Congressional investigations established that some unions, having fallen under the dictatorial control of criminals and racketeers, were no longer responsive to the demands of their membership. To curb the abuses which gave rise to these conditions and to promote internal union democracy, Congress directed unions to conduct elections in accordance with proce-

dures which are fundamental to a democratic electoral process (Title IV). Realizing, however, that a democratic election would not, in itself, eliminate dishonest officials, the legislators provided safeguards which they believed would prevent irresponsible and unscrupulous persons from gaining control of union government (Title V). To this extent the protagonists in Congress, throughout the entire legislative history, accepted language preventing persons convicted of certain crimes from holding office.

*Hodgson v. Chain Service Restaurant, L. & S. F. Emp. I., Local 11*, 355 F.Supp. 180, 183 (S.D.N.Y.1973) (footnotes omitted). Congress provided as much in its preamble to the statute:

(b) The Congress further finds, from recent investigations in the labor and management fields, that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives.

(c) The Congress, therefore, further finds and declares that the enactment of this chapter is necessary to eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives which distort and defeat the policies of the Labor Management Relations Act, 1947, as amended, and the Railway Labor Act, as amended, and have the tendency or necessary effect of burdening or obstructing commerce by (1) impairing the efficiency, safety, or operating of the instrumentalities of commerce; (2) occurring in the current of commerce; (3) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods into or from the channels of com-

merce, or the prices of such materials or goods in commerce; or (4) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing into or from the channels of commerce.

Title 29 U.S.C. § 401. The intense concern that Congress felt over criminal activity on the part of labor leaders is reflected throughout the legislative history of the measure. S.Rep. No. 187 on S. 1555 as reported, 86th Cong., 1st Sess., 2–4, 12–16 (1959) as contained in 1 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 398–400, 408–412 (1959) [hereinafter cited as 1 Legislative History]; H.Rep. No. 741 on H.R. 8342 as reported, 86th Cong., 1st Sess., 1–7, 9–13 (1959) as contained in 1 Legislative History, 759–765, 767–771, U.S.Code Cong. & Admin. News, p. 2318. *See also* 105 Cong.Rec. 5983 (1959) (remarks by Sen. Kennedy); 105 Cong.Rec. 6131 (1959) (remarks by Sen. Ervin) as contained in 2 Legislative History 1032–1034; 105 Cong.Rec. 7021–22 (1959) (remarks by Sen. Kennedy), as contained in 2 Legislative History 1258–1259; 105 Cong. Rec. 13860 (1959) (remarks by Sen. Williams) as contained in 2 Legislative History 1313. One of the regulatory mechanisms selected by Congress to achieve this end was the proscription contained in § 504, banning certain convicted criminals from holding union office for a period of time after their conviction and sentence. Every one of the bills introduced in Congress contained such a provision. See S. 505 (Senator Kennedy) (similar to § 504 as enacted), 1 Legislative History at 65; S. 748 (Senators Goldwater and Dirksen) (any crime resulting in loss of voting rights), *Id.,* at 113–144; S. 10002 (Senator Mundt) (same), *id.,* at 132; H.R. 4473 (Representative Barden) (including a variety of crimes in addition to "any crime the onus of which is the diversion or acquisition of funds or property belonging to another") *id.,* at 197; S. 1137 (Senator McClellan) (a variety of crimes, any crime involving moral turpitude, or any crime resulting in ineligibility to vote) *id.,* at 315; H.R. 7265 (Representative Kearns) (any felony) *id.,* at 617. Although the members of

Congress differed on the specifics, it is thus clear that there was general sentiment in favor of applying the proposed ban on office-holding to a wide variety of crimes; and, conversely, there was no sentiment in favor of restricting its application to "union-related" activity. The list which emerged, while narrower in scope than some of the proposed bills, is nonetheless broad and far-reaching in scope. The case law goes still farther.

■ The case law does not restrict the ambit of § 504 to the four corners of the list of generic crimes specified by Congress. The obvious impossibility of drafting federal legislation which makes specific, as opposed to generic, reference to state-proscribed criminal activity compels such a reading of the Act. The courts have unanimously held that § 504 must be given broad application in light of the Congressional intent to purge the labor movement of its criminal element:

> Recognizing that a narrow reading of § 504(a) would seriously impair the efficacy of the Act, the courts have uniformly held § 504(a) to be a remedial statute which should be liberally construed. When confronted with issues requiring the interpretation of the language, the courts have refused to put form ahead of substance.

*Hodgson v. Chain Service Restaurant, L. & S. F. Emp. I., Local 11, supra,* at 184. State law and federal law, in this context, are given "conjoint and not disparate" effect. *Serio v. Liss, supra,* at 390. A variety of crimes not specifically enumerated in § 504(a) have thus been held to trigger application of its sanctions. *Hodgson v. Chain Service Restaurant, L. & S. F. Emp. I., Local 11, supra* (conspiracy to violate other provisions of Title 29); *Lippi v. Thomas,* 298 F.Supp. 242 (M.D.Pa.1969) (misapplication of bank funds in violation of Title 18 U.S.C. § 656); *Berman v. Local 107, I.B.T. etc.,* 237 F.Supp. 767 (E.D.Pa. 1964) ("conspiracy to defraud" a union under Pennsylvania law); and *Postma v. International Brotherhood of Teamsters, etc., Local 294,* 229 F.Supp. 655 (N.D.N.Y.), *aff'd,*

337 F.2d 609 (2nd Cir.1964) (conspiracy to violate Title 18 U.S.C. § 1951). *Cf. United States v. Priore,* 236 F.Supp. 542, 544 (E.D. N.Y.1964); *Serio v. Liss, supra.*

Illario rests his arguments upon two assertions. First, he contends that what he terms the "exercise of discretion" on the part of the state judge who sentenced him should guide this Court in its application of § 504. In addition, he directly disputes that Congress intended to cover the conduct of which he was convicted when it enacted § 504.

██ The first argument is easily put aside. Illario urges that the decision by the state trial judge to suspend the term of incarceration and to refrain from conditioning probation upon Illario's resignation from union activity should be a "weighty factor" to be considered by this Court in construing § 504. (Plaintiff's Brief, at 4–5) Such an assertion is wholly unwarranted. There is no doubt that the issue of Illario's continued participation in union affairs was of serious concern to Illario when he entered into his plea bargain. But the trial court was careful to disclaim any influence on the course of subsequent events before receiving the plea:

> THE COURT: Okay. Do you understand, and I'm quite sure that this is within your thinking on this, that this Court has no power to guarantee anything with respect to your future participation in union affairs? That's something that's simply out of my hands.
>
> THE DEFENDANT: Yes, I understand that.
>
> THE COURT: Do you understand that?
>
> THE DEFENDANT: Yes.

Tr. 2/9/76, at 8. Only after this disclaimer of reliance was the plea accepted. When the presentence report was prepared, however, it contained, in part, the following statements attributed to the defendant:

> DEFENDANT'S VERSION: The subject [Illario] totally denies the charges in the indictment. He states that he pled guilty to the accusation on the advice

of his attorney, knowing the ramifications of the plea, in that he would not be in violation of Federal Code 504, [sic] and would therefore be allowed to retain his union position. He informed this officer that he is excercising [sic] his right to plead guilty to the accusation, although he states that the money was forced upon him by Davis, whom the defendant claims told him "Here, take the money."

Presentence Report, at 2. The Court's attention was drawn immediately to the reference to § 504 contained in the statements attributed to Illario, and it reiterated its previous statements with respect to § 504:

> THE COURT: One other thing. Mr. Illario, there is a reference in the presentence report to the Section 504 problem and that is whether or not the Federal Government is going to take any action with respect to continued participation in union affairs. You recognize that that is a matter not under this Court's control and that whatever happens with the Federal Government happens and whether anyone will be moved to take action in that regard or whether any such action would be successful simply is in front of you and not behind you?
>
> THE DEFENDANT: I understand that.
>
> MR. BROWN [Defense Counsel]: If your Honor please, may I be heard on that too?
>
> THE COURT: Yes.
>
> MR. BROWN: Mr. Illario, isn't it a fact that I informed you that in terms of any Federal action that there was a serious question and that the issue was not cut and dry as to whether or not there was a violation of anything?
>
> THE DEFENDANT: Yes, sir.
>
> MR. BROWN: But that was not a condition of your pleading in here except in our conversations with respect to your possible future complications; is that right?
>
> THE DEFENDANT: That was discussed.

MR. BROWN: And we have conferred about that in terms of your interests; is that correct?

THE DEFENDANT: Yes, sir.

MR. BROWN: But it has nothing to do with this plea.

THE DEFENDANT: No.

MR. BROWN: Thank you.

Tr. 3/22/76, at 4–6. The State Court was, of course, entirely correct in its estimation of the irrelevance of its sentencing decision to the present legal application of § 504. Plaintiff agreed then and cannot now be heard to argue to the contrary.

But the argument as set forth in plaintiff's papers goes further. It is really bottomed on the relatively light sentence meted out by the state court. The argument, in essence, seeks to minimize plaintiff Illario's culpability. Illario argues that what he alleges was the relatively inconsequential nature of his conduct, as reflected in the comments made by the state judge at the time of sentence, should here weigh in his favor on the question of applicability of § 504.

▆ The state court clearly exercised considerable leniency in Illario's case. But that leniency is not properly before this Court. The trial on the bribery indictment did not reach the end of the government's direct case, much less a jury verdict on Illario's guilt or innocence. It was resolved through a negotiated plea bargain which included as one of its elements the promise of silence on the part of the State at sentencing. Under these circumstances this Court will rely solely upon the confession of guilt made by Illario when he pleaded guilty to the Accusation. Neither Illario nor the United States is free to relitigate the degree of Illario's blameworthiness in the face of his confession of criminal activity.[2] The sole issue confronting this Court is whether the confession of guilt to the charges contained in the Accusation implicates § 504.

The second prong of Illario's argument addresses itself directly to this issue of statutory construction. Plaintiff contends that the "manifest" Congressional intent "precludes" his removal from office under § 504. (Brief, at 5) Although § 504 includes both "bribery" and "grand larceny" in its terms, the crime to which Illario pleaded guilty, obtaining money by false pretenses, is not mentioned. Because he characterizes the record before this Court as being "without a hint or suggestion that [his] misdeed involved his union position or association," (Brief, at 7), he argues that a strict construction of § 504 is appropriate. He points to the continuing technical distinctions between various forms of larceny and obtaining money by false pretenses, and argues that since his conduct under New Jersey law constituted the one and not the other, application of the term "grand larceny" is inappropriate. The United States argues for the essential equivalence of the crimes.[3]

Illario's invocation of the common-law distinctions between larceny by trick and obtaining money by false pretenses has a somewhat hollow ring. There is no doubt that a distinction was made between the

2. The Court notes that Congress has explicitly provided Illario with a forum in which to raise such arguments. The United States Parole Commission is authorized under the statute to issue certificates of exemption from the statutory proscriptions of office-holding in appropriate cases. See Title 29 U.S.C. § 504(a)(2)(B), as implemented by 28 C.F.R. §§ 4:1–4:17 (1975).

3. The United States additionally argues that the conduct to which Illario pleaded guilty also constitutes a completed act of bribery under N.J.S.A. 2A:93–6. See *State v. Ferro,* 128 N.J. Super 353, 320 A.2d 177 (App.Div.1974) (holding that a recipient of money need not be a public official to be guilty of bribery). It is not at all clear from the *dicta* in *Ferro,* however, that New Jersey courts would extend the ambit of the bribery statute to include the act to which plaintiff confessed, namely, the corrupt receipt of money through a *false* promise to influence governmental action. The facts in *Ferro* support the inference that the defendant in that case did intend to attempt to influence governmental activity in return for the receipt of the money. No case has applied the New Jersey bribery statute to a situation in which the promise of influence was deceitful from the outset. Compare *State v. Ferro, supra,* with Tr. 2/9/76, at 5–6.

two crimes at common law, see LaFave and Scott, *Criminal Law,* at 618–630, 655–672 (1972). There is similarly no doubt that certain of these distinctions were carried over into the criminal statutes codified by the New Jersey Legislature. Compare N.J. S.A. 2A:111–1 with N.J.S.A. 2A:119–2. As the United States contends, there is some doubt as to the sanctity accorded to these distinctions by the New Jersey courts in practice. See generally, *Rudolph v. Home Indemnity Company,* 138 N.J.Super. 125, 350 A.2d 285 (Law Div. 1975); *State v. Fary,* 16 N.J. 317, 108 A.2d 593 (1954); *State v. Deutsch,* 77 N.J.L. 292, 72 A. 5 (N.J.1909). In actual practice, the distinctions between obtaining money by false pretenses and larceny by trick have apparently eroded even in a jurisdiction such as New Jersey, which has not yet followed the lead of commentators and other jurisdictions, *see* Perkins, *Criminal Law,* at 319–320 (1969), and unified all theft offenses in one codification.

It was, in part, this decay in the common-law forms of criminal action that led the courts in *Berman v. Local 107, I.B.T., etc., supra,* and *Lippi v. Thomas, supra,* to apply the term "grand larceny" as used in § 504 to offenses which would not be, strictly speaking, larceny at common law. But more important considerations motivated the *Berman* and *Lippi* courts; considerations which are equally applicable here.

■■■ Regardless of the technical distinctions between the crimes, the essential question of statutory construction remains the discovery of the intent of Congress. Courts are agreed that the enumeration of offenses in § 504 was intended to be generic and inclusive, rather than specific and exclusive. The inquiry to be undertaken is thus not into common law survivals presently reflected in various differentiations made by the New Jersey Penal Code. The test is instead whether the conduct described in the Accusation was conduct which Congress intended to suppress. A major premise of Illario's argument is that the crime to which he confessed by his plea was wholly unrelated to the conduct of his union affairs. It is this assertion that he relies upon to support his request for a "strict" construction of § 504. This Court cannot accept this premise.

■■■ It is disingenuous in the extreme to argue that when a union official defrauds an employer in his industry by posing as one able and willing to corrupt a local government, such conduct is unrelated to the interests of the union itself. Nothing could be further from the truth. It was his position as a union official which gave Illario the opportunity to undertake his criminal fraud. It was the abuse of his fiduciary position of trust which formed the predicate for his acts. In fraudulently enriching himself by his offer to traffic in the favors of government on behalf of an employer, he debased his union office as well as himself. This Court has no doubt whatsoever that Congress intended in § 504 to preclude a union leader who sought personal profit from an employer by means of a purported "fix" of local government from further participation in union governance. Illario bargained for the disposition of a bribery indictment by [pleading his guilt] to obtaining money by false pretenses, a corrupt act that could not fail to injure the interests of the workers, those of the union, and ultimately, those of the local government he purported to be able to influence. The conduct to which he confessed is functionally identical to larceny by trick at common law. It is uncertain that even New Jersey, which preserves (at the moment) the distinction between theft offenses, would unhesitatingly apply it in such a case. Under these circumstances there is no difficulty in holding that when Congress enumerated grand larceny in § 504, it intended to reach conduct not dissimilar to that revealed here. No other result would be consistent with the expressed prophylactic intent of the legislation. Accordingly, it is the holding of this Court that the conduct to which Illario pleaded guilty is within the ambit of § 504. The plaintiff's application for a preliminary injunction is denied. Summary judgment is entered on behalf of all defendants.